IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PATRICIA A. HELSCEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-22-374-SPS |
| ) | |
| MARTIN O'MALLEY,[1] ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

The claimant Patricia A. Helscel, requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

---

[1] On December 20, 2023, Martin J. O'Malley became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted for Kilolo Kiakazi as the Defendant in this action.

engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). *See also Casias*, 933 F.2d at 800-01.

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

**Claimant's Background**

Claimant was born on November 6, 1987, and was 32 years old on the alleged disability onset date. (Tr. 43-44). She was 34 years old at the time of the most recent administrative hearing. (Tr. 388). She has completed her GED and has past relevant work experience working in fast food establishments, in an agricultural hatchery, as a caretaker, and gas station attendant. (Tr. 44, 94). Claimant asserts she has been unable to work since March 10, 2020, alleging disability due to issues with hearing loss, high blood pressure, allergies/sinus infections, and anxiety. (Tr. 19, 92, 102, 169-170, 191).

**Procedural History**

Claimant applied for disability insurance benefits pursuant to Title II of the Social Security Act in June 2021, alleging disability beginning on March 10, 2020. (Tr. 169–70, 191). Claimant's application was denied initially and on reconsideration. Following an administrative hearing, ALJ Luke Liter issued a written opinion on July 26, 2022, determining Claimant was not disabled. (Tr. 19–33). The Appeals Council denied review, making the ALJ's written opinion the Commissioner's final decision for purposes of this appeal. (Tr. 5). *See* 20 C.F.R. § 404.981.

**Decision of the Administrative Law Judge**

The ALJ made his decision at step five of the sequential evaluation. At step two, the ALJ found that Claimant had several severe physical and mental impairments, including bilateral mixed conductive and sensorineural hearing loss, major depressive disorder, and generalized anxiety disorder. (Tr. 22).

Next, he found that Claimant's impairments did not meet a listing. (Tr. 23). At step four, he found that Claimant retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations:

> The job environment should not expose the claimant to unprotected loud noise environments. The claimant can understand, remember, and carry out simple tasks and detailed tasks. Public contact should not be part of the job duties. The claimant can tolerate superficial interaction (brief and cursory) with coworkers and supervisors. The claimant can tolerate standard levels of supervision. The claimant would work best alone (defined as working alone with respect to the task performed, not proximity to other coworkers). The claimant could adjust to a work environment and changes in the work environment.

(Tr. 25).

The ALJ found that this RFC allowed Claimant to perform her past relevant work, but found in the alternative at step five, based on testimony form the vocational expert at Claimant's hearing, that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. 31-33).

### Review

Claimant contends the ALJ erred because his hypotheticals posed to the vocational expert failed to contain all the limitations found by the non-treating, non-examining reviewers of the State agency, and the ALJ's hypothetical questions were also inconsistent with his RFC. The Court agrees and the decision of the ALJ must therefore be reversed.

The relevant evidence before the ALJ reflects that On August 25, 2021, Claimant had a psychological examination by Peter Ciali, Ph.D. (Tr. 313-316). She was living with her mentally retarded sister and her brother who has cerebral palsy and requires considerable care. (Tr. 54-56, 314). Dr. Ciali found her attention and concentration were at a reasonable level and her memory for recent and remote events was slightly impaired, while she was slightly anxious and demonstrated slight restless motor overflow. (Tr. 313). Her insight and judgment were only fair. *Id*. She had suffered family sexual abuse, achieved her developmental milestones late, and was in special education classes through the third grade; she dropped out of school in the tenth grade but has obtained her GED. (Tr. 313-314). She had no close friends and disliked crowds. Her score on

the PHQ-9 test for depression was one point away from a score indicating major depression, and featured anhedonia, problems sleeping, feeling tired, overeating, feeling bad about herself, restlessness, and trouble concentrating. (Tr. 314). Her score on the GAD-7 test was 21/21, indicating severe anxiety, and featured nervousness, feeling on edge, trouble controlling her worrying, trouble relaxing, restlessness, irritability, and feeling afraid as if something awful might happen. *Id*. Claimant's score on the MoCA test was 23/30, indicating mild cognitive impairment. (Tr. 314-315).

The mental CE diagnosed Claimant as having Major Depressive Disorder, Moderate and Generalized Anxiety Disorder. (Tr. 315). He found she could manage funds and had a fair prognosis with treatment. "Her ability to perform work related mental activities including remembering information, understanding instructions, and maintaining sustained concentration are mildly impaired. Her ability to socially interact and adapt is moderately impaired at this time." (Tr. 315).

On August 28, 2021, Claimant was evaluated by a physical CE. (Tr. 319-324). His examination was essentially within normal limits except for morbid obesity and uncontrolled hypertension. (Tr. 315). She had histories of decreased hearing in her right ear and of anxiety. *Id*.

In March and April 2022, Claimant was treated at Family and Children's Services Clinic for Generalized Anxiety Disorder and Major Depressive Disorder, Recurrent, Moderate. (Tr. 351-388). She has a history of suicidal ideations in her late teens, and early twenties. (Tr. 363, 583). She had difficulties with sleep, self-image and avoided social contact, but did not hallucinate or have paranoid delusions. *Id*. Being around her family increased her anxiety and she had no close friends. (Tr. 365). Claimant's CAR scores indicated possible barriers to treatment in the domains of feeling, thinking, role performance, medical, family, and interpersonal. (Tr. 379). She had some

panic attacks with nervousness and "freaking out." (Tr. 383). Her insight and judgment were considered to be fair. (Tr. 384). She was prescribed Cymbalta and was compliant with her medication. (Tr. 372, 384, 387). She also had an audiological evaluation because of a hearing loss, and the evaluation demonstrated that Claimant had a moderately severe mixed conductive and sensorineural hearing loss in the right ear, and a slight sensorineural loss in the left ear. Both ears achieved excellent discrimination. (Tr. 327-328).

Claimant was seen and treated for anxiety and hypertension by Kenneth Kirk, M.D. (Tr. 389-487). Her blood pressure measured 140/90 in April 2022, which was diagnosed as Stage I Hypertension. (Tr. 409, 427). Her PHQ-9 test for depression improved to 4, which is considered normal. (Tr. 415-416).

An administrative hearing was held before an administrative law judge ("*ALJ*") on June 23, 2022. (Tr. 19, 38-65). She testified about her unstable mood and how her anxiety builds up and turns into a panic attack which may last ten minutes. (Tr. 57-58). Her anxiety can be so severe that she cannot leave her house unless it is absolutely necessary. (Tr. 59). It is made worse by crowds and arguments. (Tr. 48, 52, 58). She estimated that she was at home 23 of 24 hours a day. (Tr. 54). Her time is chiefly occupied by caring for her brother who has cerebral palsy so badly that he is almost immobile. (Tr. 54-55). She must enlist another brother to aid her in moving him. (Tr. 54-55).

The ALJ found Claimant's decreased hearing, major depressive disorder and generalized anxiety disorder were severe impairments. (Tr. 22). He found the Claimant's hypertension and obesity were non-severe impairments. *Id.* At step four, the ALJ propounded two hypotheticals to the VE. (Tr. 61-64). In his first hypothetical to the VE, the ALJ's exchange with the VE was as follows:

ALJ:   [a]ssume a hypothetical individual same age, same level of education, and past work experience as our claimant in this case. Assume that … individual should avoid exposure to unprotected loud noise environments. Additionally, assume this hypothetical person can understand, can remember, can carry out both simple tasks as well as detailed tasks. Assume public contact should not be a part of the job duties but assume that this hypothetical person could tolerate what I'm going to call superficial interaction with coworkers and supervisors. I define that as brief and cursory contact with these individuals. Assume that this person could tolerate standard levels of supervision and not need any supported supervision or extra supervision. However, assume that the job duties would be such that this hypothetical person could mainly work alone with respect to the tasks being performed with respect to proximity to other workers. For example, this person should not be part of a team or a group task. Assume that this hypothetical person could adjust to a work environment along with changes in work environment. How would these limitations in your opinion, affect those past jobs that were described?

VE:    Just to confirm there were no exertional limitations, correct?

ALJ:   That is correct. Yes.

VE:    Then with that being said the job of poultry hatchery laborer that's at a moderate noise level and so that would still be available. The others would not.

(Tr. 61-62).

Moving on to step five, the VE found Claimant could perform the jobs of Marker, D[ictionary of] O[ccupational] T[itles] ("*DOT*"); Router; and Small Products Assembler. (Tr. 63).

The ALJ then proceeded to inquire as follows:

ALJ:   What happens if we adjust the limitations that I gave you just a little bit from that first hypothetical and specifically targeting the interaction with coworkers and the requirement of the necessity to work alone? In this hypothetical, I would define that element as needing to work alone both with respect to the task being performed, so same as the first hypothetical no teamwork or group tasks, as well as the need to be proximate in their own type of space away from others. So, it would address both the proximity and the task element of working alone. How would that affect things?

VE:    That would eliminate past work. And in my opinion, that's an accommodation so it would eliminate competitive employment.

(Tr. 63-64).

At step four, the ALJ found, with the help of a VE, that Claimant could return to her past

relevant work as a hatchery poultry laborer. (Tr. 31). At step five the VE testified there were other jobs available, two of which the ALJ found to be present in sufficient numbers: Marker, and Router. (Tr. 32-33).

Claimant's challenges to the ALJ's assessment of her RFC relate only to the State agency reviewing psychological consultants' prior administrative findings. First, she argues that the ALJ's assessment of her RFC was flawed because the ALJ's found Plaintiff could perform simple and some detailed tasks which did not account for the reviewers' opinions that Claimant has moderate limitations in the ability to adapt to changes in the workplace. (Tr. 108). Claimant also contends the ALJ did not account for the mental reviews which established she had a moderate limitation in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* Finally, Claimant alleges the ALJ's finding Claimant could respond to routine supervision (Tr. 25), directly contradicted the State agency reviews which determined Claimant was moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 97, 108).

When a medical source assesses functions that limit a claimant's work activity, the ALJ must explain why that functional limitation does not appear in the RFC. *Frantz v. Astrue*, 509 F.3d 1299, 1302-1303 (10th Cir. 2007); *Givens v. Astrue*, 251 Fed. Appx. 561, 568 (10th Cir. 2007). Here, the mental CE found moderate limitations in the claimant's ability to adapt to changes in the workplace area, and both mental reviewers agreed that there were deficits in this area of function, but the ALJ failed to account for these limitations in the claimant's RFC.  The Commissioner observes that if the ALJ finds an opinion of a medical source only partly persuasive, he can reference sections he chooses and ignore other parts.  However, if this is what the ALJ intended he should have explained why the limitations were not included in the claimant's RFC. *Frantz*, 509 F.3d at 1302-1303; *Givens*, 251 Fed. Appx. at 568.

The claimant also contends that the hypothetical questions posed to the vocational expert (VE) as part of the step five evaluation were inconsistent with each other and with the claimant's RFC. The Commissioner counters that this was a harmless scrivener's error, but such an error is harmless only if it does not affect the outcome of the case. *See Poppa v. Astrue*, 569 F.3d 1167, 1172 n. 5 (10th Cir. 2009); *Gaghins v. Astrue*, 2012 WL 10561 *9 (N.D.Okla. 2012) [unpublished]. While it is not necessary to resolve this dispute given the Court's conclusion that the ALJ failed to properly determine the claimant's RFC at step four, the Court does observe that the ALJ should at least have explained why these discrepancies did not affect his disability determination.

The decision of the Commissioner must accordingly be reversed and the case remanded to the ALJ for further analysis as discussed above. If on reconsideration the ALJ finds that any changes must be made to the claimant's RFC, he should then redetermine what work, if any, the claimant can perform and ultimately whether she is disabled.

## Conclusion

The Court finds that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. Accordingly, the Court finds the decision of the Commissioner is hereby REVERSED and the case REMANDED for further proceedings consistent herewith.

**IT IS SO ORDERD this 20th day of March, 2024.**

_____
STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE